NIAGARA MOHAWK POWER CORP.
v.
FEDERAL POWER COMMISSION.
No. 11668.

United States Court of Appeals
District of Columbia Circuit.
Argued Nov. 14, 1953.
Decided Jan. 21, 1954.

Mr. Lauman Martin, New York City, for appellant.

Mr. Howard E. Wahrenbrock, Asst. General Counsel, Federal Power Commission, Washington, D. C., with whom Mr. Theodore French, Attorney, Federal Power Commission, Washington, D. C., was on the brief, for appellee. Mr. Bradford Ross, General Counsel, Federal Power Commission, Washington, D. C., at time brief was filed, also was on the brief for appellee.

Before WILBUR K. MILLER, PRETTYMAN and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

For many years before and after it became the licensee of Project 16 at Niagara Falls, under the Federal Power Act, 16 U.S.C.A. § 791a et seq., Niagara Falls Power Company was obligated to furnish to the Aluminum Company of America mechanical power which the latter used in generating direct current electricity to operate an aluminum reduction plant. The obligation arose from a series of five contracts entered into by the two companies or their predecessors, beginning in 1895, under which Alcoa constructed its reduction plant on a nearby non-project site leased from a predecessor of Niagara Falls Power Company. The contractual arrangement, which was increased in 1922 to provide for annual deliveries of 52,000 mechanical horsepower, was to endure until May 1, 1967.

Under the contracts, Alcoa paid for the mechanical power at the annual rate of $8.00 per mhp, which is the equivalent of $11.50 per kilowatt per year, or about one and one-third mills per kilowatt hour. As the electric customers of the Power Company were paying three mills per kwh for energy supplied to them, and as their demand was constantly increasing, the Niagara Falls Company desired to escape from its contractual obligation so as to devote to its own purposes the mechanical power being furnished to Alcoa, and thereby to realize greater revenue therefrom.

Negotiations to that end, begun by Niagara Falls Power Company in 1946, culminated in a contract dated March 7, 1947. It was agreed that the existing arrangement should be cancelled as of March 1, 1949, upon payment of the sum of $1,500,000 to Alcoa by the Power Company. When that day arrived, closing contracts were executed and the money was paid in accordance with the agreement.[1]

Thereafter, the Power Company attached its own 60 cycle alternating current generators at a cost of about $2,500,000, and began to supply energy therefrom to its electric customers. These sales produced annual revenue of about $1,059,000 as against $416,000 which had been received from Alcoa for the mechanical power. Thus, through expenditures aggregating about $4,000,000, the Niagara Falls Power Company obtained an increase of approximately $643,000 in annual revenues.

Before the cancellation agreement became effective, Niagara Falls Power Company submitted the proposed arrangement to the Treasury Department, and on December 9, 1948, the Commissioner of Internal Revenue entered into a "closing agreement" with the Power Company which defined the payment of $1,500,000 to Alcoa as "a capital expenditure which will be subject to deductions for amortization over the unexpired period of the old leases, beginning March 1, 1949."

After the cancellation had become effective, the Power Company filed with the Public Service Commission of New York, which has regulatory authority over its electric rates, a petition for permission to amortize through operating expense accounts, during the unexpired period of the cancelled contracts, the sum of $1,500,000 which it had paid to Alcoa and which it then held in its Account 146. The Public Service Commis-

sion authorized such amortization by an order entered November 14, 1949.

On January 20, 1950, the Niagara Falls Power Company filed a petition with the Federal Power Commission setting forth the facts which we have summarized above, and requesting the Commission to authorize it

"* * * for all accounting requirements subject to the jurisdiction of the Commission under the Federal Power Act to amortize the above-described expenditure of $1,500,000 over the period March 1, 1949—May 1, 1967 by ratable monthly charges to operating expenses."

Hearings were held in March and April, 1951, and the Trial Examiner filed his decision April 10, 1952. He found that Niagara Mohawk Power Corporation[2] had failed to show the proposed amortization to be reasonable or appropriate for use in the determination of future additions to amortization reserves established and maintained pursuant to § 10(d) of the Federal Power Act, which is quoted at length hereinafter; and that it had not proved necessity for the payment to Alcoa. The Trial Examiner concluded the expenditure is not an operating cost applicable to future periods but is a loss voluntarily incurred by Niagara Falls Power Company under the Alcoa contracts; that the proper accounting treatment of the expenditure under the Federal Power Act is the immediate charge-off to Account 271, "Earned Surplus." He also concluded that the expenditure of $1,500,000 should not be considered in determining the portion of the licensee's earnings to be transferred to the amortization reserves required by § 10(d) of the Act.

Niagara Mohawk seeks review of the following order, entered October 3, 1952, by the Federal Power Commission,

2. Through a consolidation of corporations in October, 1950, the Niagara Falls Power Company was succeeded as licensee by Niagara Mohawk Power Corporation, the present petitioner.

1. The sum of $1,500,000 so paid was held by Niagara Falls Power Company in its Account 146, "Other Deferred Debits."

which adopted the Trial Examiner's views:

"(A) The application, filed on January 20, 1950, by The Niagara Falls Power Company (Niagara Mohawk Power Corporation, successor licensee) for an order approving the amortization by ratable monthly charges to operating expense of the amount of $1,500,000, which it paid to the Aluminum Company of America with respect to agreements dated March 7, 1947, and March 1, 1949, is hereby denied.

"(B) Petitioner shall charge off the expenditure referred to in Paragraph (A) to Account 271, Earned Surplus.

"(C) The charge to Account 271, Earned Surplus, ordered in Paragraph (B) above shall not be considered in computing the surplus earned in excess of a specified reasonable rate of return for the purpose of establishing and maintaining amortization reserves under the provisions of Section 10(d) of the Federal Power Act."

Section 301(a) of the Federal Power Act requires every water power licensee and every public utility to make, keep and preserve such accounts, records and memoranda as the Federal Power Commission may by rules and regulations prescribe as necessary or appropriate in the administration of the Act. The section authorizes the Commission to prescribe a system of accounts to be kept by licensees and public utilities, and includes the following:

"* * * The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry * * *."

It was therefore the burden of Niagara Mohawk to justify the amortization of the Alcoa payment when it was questioned by the Commission. The justification offered is that, through the questioned expenditure and the installation of its own generators, the petitioner not only largely increased its earnings but also made available for general distribution 53,000,000 kwh per annum—additional energy which was sorely needed. So, Niagara Mohawk contends the Commission's order is an unwarranted interference with its management of its own business.

But the Commission has not interfered with management. Despite the order complained of here, the additional energy continues to flow to the petitioner's electric customers, and it continues to enjoy the enlarged revenue thereby produced. It still has the right, granted by the New York Commission, to amortize the Alcoa payment for electric rate-making purposes; and, under the Treasury ruling, for the computation of federal income taxes. The main impact of the Commission's order is for the purposes of § 10(d) of the Act,[3] which reads as follows:

"(d) That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the propor-

3. If the power developed by the licensee, or any part thereof, should ever enter into interstate or foreign commerce in circumstances such that the Federal Power Commission would have regulatory authority over the rates charged therefor under § 20 of the Act, the order now under consideration would have impact on such rates because it operates to reduce the licensee's net investment required by § 20 to be used as the rate base in regulation by the Commission.

tion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license."

Petitioner's license requires that, after the first twenty years of operation, one-half of surplus earned in excess of an annual return of six per cent on net investment shall be held in the amortization reserves established and maintained as provided in § 10(d) for the purposes therein set forth. Thus the Commission's refusal to recognize the Alcoa payment as an operating expense, or as a charge to surplus for the purposes of § 10(d), serves to increase by $750,000 the petitioner's amortization reserves, which will ultimately be applied to reduce the net investment the United States must pay should it elect to acquire the property at the termination of the project, as permitted by § 14 of the Act.

This ruling, clearly within the Commission's authority under § 4(a) to regulate petitioner's accounts for the purposes of § 10(d), must be sustained unless we find that the record, considered as a whole, does not show a substantial basis for the Commission's action. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 487–489, 71 S.Ct. 456, 95 L.Ed. 456. Certainly its ruling cannot be sustained if the Commission acted without supporting proof and in the face of adequate and undisputed contrary evidence. The question, then, is whether the petitioner carried the burden of justifying its proposal to amortize the cancellation cost through annual charges to operating expense. To sustain that burden, we think it was incumbent on the petitioner affirmatively to show the payment to Alcoa was necessary to obtain cancellation of the contracts and the subsequent increase in its own earnings. It signally failed to do so. There was evidence tending to show Alcoa's reduction plant at Niagara Falls was antiquated in comparison with its other plants and was operated at relatively high cost despite the cheap mechanical power; and in 1946 and 1947, because of the cessation of hostilities, the future demand for aluminum was not too bright. Such evidence at least indicates that, in those years, Alcoa might well have welcomed gratuitous cancellation, as it could demand termination of its lease and power contracts only by paying a penalty of $1,921,500. Yet, in those circumstances, petitioner paid Alcoa $1,500,000 to obtain cancellation.

The petitioner's main objective was to increase its own revenues. Its president testified that if, through regulatory action, the Niagara Falls Power Company could have obtained an increase in the rate paid by Alcoa for mechanical power so as thereby to obtain as much additional revenue as it obtained through its new electrical installations, the payment to Alcoa for cancellation probably would not have been made. He also admitted that Alcoa's rate of $8.00 per mhp was discriminatorily low. Yet the Power Company did not apply to the Federal Power Commission [4] for relief from the low rate before paying the sum of $1,500,000 to escape from it.

We cannot say, of course, that the Federal Power Commission would have increased the mechanical power rate to an equivalent of the three-mill electric rate, had the Power Company petitioned it for an increase therein. But certainly such a petition would have been entertained and, in view of what seems plainly to have been a discriminatory situation, it is highly probable that some relief would have been granted.

It is our view that Niagara Mohawk failed to justify its proposed accounting treatment of the Alcoa payment. Accordingly we do not reach the other arguments advanced by the Commission.

Affirmed.

4. Under § 19 of the Act, the Federal Power Commission clearly had regulatory authority over the rate for mechanical power sold to Alcoa, since New York had not extended such authority to its Public Service Commission. Aluminum Co. of America v. Maltbie, 1942, 289 N.Y. 357, 45 N.E.2d 908.